# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) PRODUCTS LIABILITY LITIGATION | MDL NO. 3094 <br><br> THIS DOCUMENT RELATES TO ALL CASES <br><br> JUDGE KAREN SPENCER MARSTON |
| KEITH N. JOHNSON, <br>     Plaintiff, <br><br> v. <br><br> NOVO NORDISK INC. and NOVO NORDISK A/S, <br>     Defendants. | COMPLAINT AND JURY DEMAND <br><br> CIVIL ACTION NO.:  2:25-cv-2183 |

## COMPLAINT AND DEMAND FOR JURY TRIAL

-----------------------------------------------------------------------------------------------------------------

Plaintiff, Keith N. Johnson, by Plaintiff's attorneys, The Gori Law Firm, P.C., upon information and belief, at all times hereinafter mentioned, alleges as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because Defendants are incorporated and have their principal places of business in states other than the state in which Plaintiff resides, which is Arkansas.

2. This Court has personal jurisdiction over Defendants, consistent with the United States Constitution and Ark. Code Ann. § 16-4-101 (Arkansas "long arm" statute), as Plaintiff's claims arise out of Defendants' transaction of business and the tortious acts within the State of Arkansas, and by virtue of Defendants' substantial, continuous, and systematic contacts with the State of Arkansas unrelated to Plaintiff's claims.

## NATURE OF THE CASE

3.     This is an action for damages suffered by Plaintiff, Keith N. Johnson, who was severely injured as a result of Plaintiff's use of Ozempic, an injectable prescription medication that is used to control blood sugar in adults with type 2 diabetes.

4.     Ozempic is also known as semaglutide. Ozempic works by stimulating insulin production and reducing glucose production in the liver helping to lower blood sugar levels.

5.     Ozempic belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs").

6.     Defendants acknowledge that gastrointestinal events are well known side effects of the GLP-1RA class of drugs.[1] However, Defendants have downplayed the severity of the gastrointestinal events caused by their GLP-1RAs, never, for example, warning of the risk of gastroparesis ("paralyzed stomach") and its sequalae.

7.     Gastroparesis is a condition that affects normal muscle movement in the stomach. Ordinarily, strong muscular contractions propel food through the digestive tract. However, in a person suffering from gastroparesis, the stomach's motility is slowed down or does not work at all, preventing the stomach from emptying properly. Gastroparesis can interfere with normal digestion and cause nausea, vomiting (including vomiting of undigested food), abdominal pain, abdominal bloating, severe dehydration, a feeling of fullness after eating just a few bites, undigested food hardening and remaining in the stomach, acid reflux, changes in blood sugar levels, lack of appetite, weight loss, malnutrition, and a decreased quality of life. There is no cure for gastroparesis.[2]

---

[1] *See, e.g.*, CT Jones, *Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*, Rolling Stone (July 25, 2023), available at https://www.rollingstone.com/culture/culture-news/ozempic-stomach-paralysis-weight-loss-side-effects-1234794601 (visited on 9/26/23).

[2] *Gastroparesis*, Mayo Clinic (June 11, 2022), available at https://www.mayoclinic.org/diseases-conditions/gastroparesis/symptoms-causes/syc-20355787 (visited on 9/26/23).

## PARTY PLAINTIFF

8.      Plaintiff, Keith N. Johnson, is a citizen of the United States, and is a resident of the State of Arkansas.

9.      Plaintiff is 74 years old. His date of birth is 02/06/1951

10.     Plaintiff used Ozempic from August 2021 to September 2023.

11.     Plaintiff's physician(s) ("prescribing physician(s)") prescribed the Ozempic that was used by Plaintiff.

12.     As a result of using Ozempic, Plaintiff was caused to suffer from gastroparesis and its sequelae and, as a result, sustained severe and permanent personal injuries, pain, suffering, and emotional distress, and incurred medical expenses.

13.     As a result of using Ozempic, Plaintiff was caused to suffer from gastroparesis and its sequelae, which resulted in, for example, dysphagia and vomiting.

## PARTY DEFENDANTS

14.     Defendant Novo Nordisk Inc. is a Delaware corporation with a principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey.

15.     Upon information and belief, Defendant Novo Nordisk Inc. is wholly owned by Defendant Novo Nordisk US Commercial Holdings, Inc.

16.     Upon information and belief, Defendant Novo Nordisk US Commercial Holdings Inc. is a Delaware corporation with a principal place of business at 103 Foulk Road, Wilmington, Delaware.

17.     Upon information and belief, Defendant Novo Nordisk US Commercial Holdings Inc. is wholly owned by Defendant Novo Nordisk US Holdings Inc.

18.     Upon information and belief, Defendant Novo Nordisk US Holdings Inc. is a

Delaware corporation with a principal place of business at 103 Foulk Road, Wilmington, Delaware.

19.    Upon information and belief, Defendant Novo Nordisk US Holdings Inc. is wholly owned by Defendant Novo Nordisk A/S.

20.    Defendant Novo Nordisk A/S is a public limited liability company organized under the laws of Denmark with a principal place of business in Bagsværd, Denmark.

21.    Defendant Novo Nordisk North America Operations A/S is a company organized under the laws of Denmark with a principal place of business in Bagsværd, Denmark.

22.    Novo Nordisk Research Center Seattle, Inc. is a Delaware corporation with a principal place of business at 530 Fairview Ave. N., Seattle, Washington.

23.    Novo Nordisk Pharmaceutical Industries LP is a Delaware corporation with a principal place of business at 3611 and 3612 Powhatan Road, Clayton, North Carolina.

24.    Defendant Novo Nordisk Pharmaceutical Industries LP is the labeler for Ozempic, and Defendants Novo Nordisk A/S and Novo Nordisk Inc. are also identified on Ozempic's label.[3]

25.    Defendants Novo Nordisk Inc., Novo Nordisk US Commercial Holdings Inc., Novo Nordisk US Holdings Inc., Novo Nordisk A/S, Novo Nordisk North America Operations A/S, Novo Nordisk Research Center Seattle, Inc., and Novo Nordisk Pharmaceutical Industries LP are referred to collectively herein as "Novo Nordisk."

26.    Novo Nordisk designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed Ozempic.

## FACTUAL BACKGROUND

### A.    FDA's Approval of Ozempic

---

[3] Ozempic prescribing information, available at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=adec4fd2-6858-4c99-91d4-531f5f2a2d79 (visited on 9/26/23).

27.     On December 5, 2016, Novo Nordisk announced submission of a new drug application (NDA) to the FDA for regulatory approval of once-weekly injectable semaglutide, a new glucagon-like peptide-1 (GLP-1) medication for treatment of type 2 diabetes. In the announcement, Novo Nordisk represented that in clinical trials "once-weekly semaglutide had a safe and well tolerated profile with the most common adverse event being nausea."[4]

28.     On December 5, 2016, Defendant Novo Nordisk Inc. submitted NDA 209637, requesting that the FDA grant it approval to market and sell Ozempic (semaglutide) 0.5 mg or 1 mg injection in the United States as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. On December 5, 2017, the FDA approved NDA 209637.[5]

29.     On March 20, 2019, Defendant Novo Nordisk Inc. submitted supplemental new drug application (sNDA) 209637/S-003 for Ozempic (semaglutide) 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk of major adverse cardiovascular events in adults with type 2 diabetes and established cardiovascular disease.[6] On January 16, 2020, the FDA approved sNDA 209637/S-003.[7]

30.     On May 28, 2021, Defendant Novo Nordisk Inc. submitted sNDA 209637/S-009, requesting approval for a higher 2 mg dose of Ozempic (semaglutide) injection. On March 28,

---

[4] Novo Nordisk, *Novo Nordisk files for regulatory approval of once-weekly semaglutide in the US and EU for the treatment of type 2 diabetes* (Dec. 5, 2016), available at
https://ml.globenewswire.com/Resource/Download/d2f719e1-d69f-4918-ae7e-48fc6b731183 (visited on 9/26/23).
[5] FDA Approval Letter for NDA 209637 (Ozempic), available at
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/209637s000ltr.pdf (visited on 9/26/23).
[6] *Novo Nordisk files for US FDA approval of oral semaglutide for blood sugar control and cardiovascular risk reduction in adults with type 2 diabetes*, Cision PR Newswire (March 20, 2019), available at
https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (visited on 9/26/23).
[7] FDA Supplement Approval Letter for NDA 209637/A-003 (Ozempic), available at
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/209637Orig1s003ltr.pdf (visited on 9/26/23).

2022, the FDA approved sNDA 209637/S-009.[8]

**B.    Novo Nordisk's Marketing and Promotion of Ozempic**

31.    On December 5, 2017, Novo Nordisk announced the FDA's approval of Ozempic (semaglutide) 0.5 mg or 1 mg injection in a press release stating that: "Novo Nordisk expects to launch OZEMPIC® in the U.S. in Q1 2018, with a goal of ensuring broad insurance coverage and patient access to the product. OZEMPIC® will be priced at parity to current market-leading weekly GLP-1RAs and will be offered with a savings card program to reduce co-pays for eligible commercially-insured patients. Additionally, as part of the access strategy, Novo Nordisk is working with appropriate health insurance providers to establish innovative contracting solutions."[9]

32.    On February 5, 2018, Novo Nordisk announced that it had started selling Ozempic in the United States and touted the medication as a "new treatment option[]" that "addresses the concerns and needs of people with diabetes[.]" Novo Nordisk offered an "Instant Savings Card to reduce co-pays to as low as $25 per prescription fill for up to two years."[10]

33.    Novo Nordisk promoted the safety and sale of Ozempic in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, and through other public outlets.

34.    On July 30, 2018, Novo Nordisk launched its first television ad for Ozempic, to the

---

[8] FDA Supplement Approval Letter for NDA 209637/S-009 (Ozempic), available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/209637Orig1s009ltr.pdf (visited on 9/26/23).
[9] *Novo Nordisk Receives FDA Approval of OZEMPIC® (semaglutide) Injection For the Treatment of Adults with Type 2 Diabetes*, Cision PR Newswire (December 05, 2017), available at https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-ozempic-semaglutide-injection-for-the-treatment-of-adults-with-type-2-diabetes-300567052.html (visited on 9/26/23).
[10] *Novo Nordisk Launches Ozempic® and Fiasp®, Expanding Treatment Options for Adults with Diabetes*, Cision PR Newswire (February 05, 2018), available at https://www.prnewswire.com/news-releases/novo-nordisk-launches-ozempic-and-fiasp-expanding-treatment-options-for-adults-with-diabetes-300592808.html (visited on 9/26/23).

tune of the 1970s hit pop song "Magic" by Pilot, wherein Novo Nordisk advertised that "adults lost on average up to 12 pounds" when taking Ozempic, even though it is not indicated for weight loss.[11]

35.    On March 28, 2022, Novo Nordisk announced the FDA's approval of sNDA 209637/S-009 for a higher 2 mg dose of Ozempic (semaglutide) injection. In the press release, Novo Nordisk represented Ozempic as having "proven safety" and advertised that "plus it can help many patients lose some weight."[12]

36.    Since 2018, Novo Nordisk has spent more than $884,000,000 on television ads in the United States to promote its semaglutide drugs (Ozempic, Wegovy and Rybelsus) with the majority of the spending allocated specifically to advertising Ozempic.[13]

37.    In 2022, Novo Nordisk spent $180.2 million on Ozempic ads, including an estimated $157 million on national television ads for Ozempic, making Ozempic the sixth most advertised drug that year. As a result of its GLP-1RA treatments, including Ozempic, Novo Nordisk forecasts sales growth of 13% to 19% for 2023.[14]

38.    On July 6, 2023, it was reported that Novo Nordisk had spent $11 million in 2022 on food and travel for doctors "as part of its push to promote Ozempic and other weight loss-inducing diabetes drugs."[15] The spending bought more than 457,000 meals for almost 12,000

---

[11] *Ozempic TV Spot, 'Oh!'*, iSpot.tv (July 30, 2018), available at https://www.ispot.tv/ad/d6Xz/ozempic-oh (visited on 9/26/23).

[12] *Novo Nordisk receives FDA approval of higher-dose Ozempic® 2 mg providing increased glycemic control for adults with type 2 diabetes*, Cision PR Newswire (March 28, 2022), available at https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-higher-dose-ozempic-2-mg-providing-increased-glycemic-control-for-adults-with-type-2-diabetes-301512209.html (visited on 10/16/23).

[13] Ritzau, *Novo Nordisk runs TV ads in US for multimillion-dollar sum*, MedWatch (April 26, 2023), available at https://medwatch.com/News/Pharma___Biotech/article15680727.ece (visited on 9/26/23).

[14] Adams B, Fierce Pharma, *The top 10 pharma drug ad spenders for 2022*, https://www.fiercepharma.com/special-reports/top-10-pharma-drug-brand-ad-spenders-2022 (visited on 9/26/23).

[15] Nicolas Florko, *Novo Nordisk bought prescribers over 450,000 meals and snacks to promote drugs like Ozempic*, National Center for Health Research (July 5, 2023), available at https://www.center4research.org/novo-nordisk-gave-doctors-450000-meals-ozempic/ (visited on 9/26/23).

doctors while also flying doctors to places like London, Paris, Orlando, and Honolulu.[16]

39.    In an article published on July 21, 2023, the President and CEO of the Alliance of Community Health Plans described Novo Nordisk's spending on meals for doctors as "outrageous" and suggested that the millions Novo Nordisk spent marketing its drugs to prescribers would be better used furthering research about potential side effects and long-term effectiveness. The author cited research published in the spring of 2023 showing an increased risk of intestinal obstruction as a result of using GLP-1RA drugs.[17]

40.    As a result of Novo Nordisk's advertising and promotion efforts, Ozempic has been widely used throughout the United States. The number of prescriptions filled reached an all-time high of 373,000 in one week in February of 2023, with more than half of those being new prescriptions.[18] In June 2023, it was reported that new prescriptions for Ozempic had surged by 140 percent from the prior year.[19]

41.    On TikTok, the hashtag #Ozempic had 273 million views as of November 22, 2022,[20] and currently has over 1.3 billion views.[21]

---

[16] Nicolas Florko, *Novo Nordisk bought prescribers over 450,000 meals and snacks to promote drugs like Ozempic*, National Center for Health Research (July 5, 2023), available at https://www.center4research.org/novo-nordisk-gave-doctors-450000-meals-ozempic/ (visited on 9/26/23).

[17] Erin Prater*, Ozempic manufacturer Novo Nordisk spent $11 million last year 'wining and dining' doctors. Experts slam the move as a breach of doctor-patient trust,* Fortune Well (July 21, 2023), available at https://fortune.com/well/2023/07/21/ozempic-novo-nordisk-meals-travel-prescribing-doctors/ (visited on 9/26/23); *see also* Erin Prater, *Weight-loss drugs like Ozempic and Wegovy may put certain people at risk of serious complications, researchers warn*, Fortune Well (March 7, 2023), available at https://fortune.com/well/2023/03/07/ozempic-wegovy-elevated-risk-intestinal-obstruction-later-type-2-diabetes-weight-loss-drug/ (visited on 10/18/23).

[18] Choi A, Vu H, *Ozempic prescriptions can be easy to get online. Its popularity for weight loss is hurting those who need it most*, CNN (March 17, 2023), available at https://www.cnn.com/2023/03/17/health/ozempic-shortage-tiktok-telehealth/ (visited on 9/26/23).

[19] Gilbert D, *Insurers clamping down on doctors who prescribe Ozempic for weight loss*, The Washington Post (June 12, 2023), available at https://www.washingtonpost.com/business/2023/06/11/weight-loss-ozempic-wegovy-insurance/ (visited on 9/26/23).

[20] Blum D, *What is Ozempic and Why Is It Getting So Much Attention?,* The New York Times (published Nov. 22, 2022, updated July 24, 2023), available at https://www.nytimes.com/2022/11/22/well/ozempic-diabetes-weight-loss.html (visited on 9/26/23).

[21] https://www.tiktok.com/tag/ozempic (visited on 11/14/23).

42.     On June 15, 2023, NBC News published a report about the "thousands of weight-loss ads on social media for the drugs Ozempic and Wegovy." While many of those ads were found to be from online pharmacies, medical spas, and diet clinics, as of June of 2023, Novo Nordisk was still running online social-media ads for its semaglutide products, despite claiming in May that it would stop running ads due to a shortage of the drug.[22]

43.     On July 10, 2023, a global media company declared Ozempic as "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."[23]

44.     At all relevant times, Novo Nordisk was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Ozempic.

## C.     The Medical Literature and Clinical Trials Gave Defendants Notice of Gastroparesis Being Causally Associated with GLP-1RAs.

45.     As previously noted, Ozempic (semaglutide) belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs").

46.     Medications within the GLP-1RA class of drugs mimic the activities of physiologic GLP-1, which is a gut hormone that activates the GLP-1 receptor in the pancreas to stimulate the release of insulin and suppress glucagon.[24]

47.     Because the risk of gastroparesis is common to the entire class of drugs, any published literature regarding the association between gastroparesis and *any* GLP-1RA (such as tirzepatide, exenatide, liraglutide, albiglutide, dulaglutide, lixisenatide, and semaglutide) should have put Defendants on notice of the need to warn patients and prescribing physicians of the risk

---

[22] Ingram D, *More than 4,000 ads for Ozempic-style drugs found running on Instagram and Facebook*, NBC News (June 15, 2023), available at https://www.nbcnews.com/tech/internet/ozempic-weight-loss-drug-ads-instagram-wegovy-semaglutide-rcna88602 (visited on 9/26/23).
[23] Bain P, *Ozempic was 2023's Buzziest Drug*, AdAge (July 10, 2023), available at https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571 (visited on 9/26/23).
[24] Hinnen D, *Glucagon-Like Peptide 1 Receptor Agonists for Type 2 Diabetes*, 30(3) Diabetes Spectr., 202–210 (August 2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5556578/ (visited on 9/26/23).

of gastroparesis associated with these drugs.

48.    In addition to pancreatic effects, the published medical literature shows that GLP-1 slows gastric emptying. As early as 2010, a study published in The Journal of Clinical Endocrinology & Metabolism indicated this effect.[25]

49.    Defendants knew or should have known of this risk of gastroparesis from the clinical trials, medical literature, and case reports.

50.    A 2016 trial funded by Novo Nordisk measuring semaglutide and cardiovascular outcomes in patients with type 2 diabetes found more gastrointestinal disorders in the semaglutide group than in the placebo group, including a severe adverse event report of impaired gastric emptying with semaglutide 0.5 mg together with other serious gastrointestinal adverse events such as abdominal pain (upper and lower), intestinal obstruction, change of bowel habits, vomiting, and diarrhea.[26]

51.    Two subjects in a semaglutide trial pool by Novo Nordisk reported moderate adverse events of impaired gastric emptying and both subjects permanently discontinued treatment due to the adverse events. Three subjects also reported mild adverse events of impaired gastric emptying in the semaglutide run-in period of trial 4376. The cardiovascular outcomes trials included two cases of gastroparesis with the first subject being diagnosed with severe gastroparesis after one month in the trial and second subject being diagnosed with gastroparesis after

---

[25] Deane AM et al., *Endogenous Glucagon-Like Peptide-1 Slows Gastric Emptying in Healthy Subjects, Attenuating Postprandial Glycemia*, 95(1) J Clinical Endo Metabolism, 225-221 (January 1, 2010), available at https://academic.oup.com/jcem/article/95/1/215/2835243 (visited on 9/26/23); American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (June 29, 2023), available at https://www.asahq.org/about-asa/newsroom/news-releases/2023/06/patients-taking-popular-medications-for-diabetes-and-weight-loss-should-stop-before-elective-surgery (visited on 9/26/23).
[26] Marso, SP, et al., Semaglutide and Cardiovascular Outcomes in Patients with Type 2 Diabetes, N. Eng. J. Med. 375:1834-1844 (November 2016), available at https://www.nejm.org/doi/10.1056/NEJMoa1607141 (visited on 10/19/23).

approximately two months in the trial.

52.     A study published in 2017 evaluated the effect of GLP-1RAs on gastrointestinal tract motility and residue rates and explained that "GLP-1 suppresses gastric emptying by inhibiting peristalsis of the stomach while increasing tonic contraction of the pyloric region." The study authors concluded that the GLP-1RA drug liraglutide "exhibited gastric-emptying delaying effects" and "the drug also inhibited duodenal and small bowel movements at the same time."[27]

53.     Another study in 2017 reviewed the survey results from 10,987 patients and 851 physicians and found that "GI-related issues were the top two patient-reported reasons for GLP-1RA discontinuation in the past 6 months, with 'Made me feel sick' as the most frequently reported reason (64.4%), followed by 'Made me throw up' (45.4%)."[28] As explained above, these are symptoms of gastroparesis.

54.     A 2019 study of the GLP-1RA drug dulaglutide identified adverse events for impaired gastric emptying and diabetic gastroparesis.

55.     In August of 2020, medical literature advised that some "patients do not know they have diabetic gastroparesis until they are put on a glucagon-like peptide 1 (GLP-1) receptor agonist such as ... semaglutide ... to manage their blood glucose." The article went on to explain that "[t]his class of drugs can exacerbate the symptoms of diabetic gastroparesis. ... Thus, GLP-1 receptor agonist therapy is not recommended for people who experience symptoms of gastroparesis."[29]

56.     In a September 2020 article funded and reviewed by Novo Nordisk, scientists

---

[27] Nakatani Y et al., *Effect of GLP-1 receptor agonist on gastrointestinal tract motility and residue rates as evaluated by capsule endoscopy*, 43(5) Diabetes & Metabolism, 430-37 (October 2017), available at https://www.sciencedirect.com/science/article/pii/S1262363617301076 (visited on 9/26/23).

[28] Sikirica M et al., *Reasons for discontinuation of GLP1 receptor agonists: data from a real-world cross-sectional survey of physicians and their patients with type 2 diabetes*, 10 Diabetes Metab. Syndr. Obes., 403-412 (September 2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5630073/

[29] Young CF, Moussa M, Shubrook JH, *Diabetic Gastroparesis: A Review*, Diabetes Spectr. (2020), Aug; 33(3): 290–297, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7428659/ (visited on 9/26/23).

affiliated with Novo Nordisk reported on two global clinical trials that evaluated the effect of semaglutide in patients with cardiovascular events and diabetes. More patients permanently discontinued taking oral semaglutide (11.6%) than placebo (6.5%) due to adverse events. The most common adverse events associated with semaglutide were nausea (2.9% with semaglutide versus 0.5% with placebo), vomiting (1.5% with semaglutide versus 0.3% with placebo), and diarrhea (1.4% with semaglutide versus 0.4% with placebo). Injectable semaglutide had a discontinuation rate of 11.5-14.5% (versus 5.7-7.6% with placebo) over a two-year period. The authors acknowledged the potential for severe gastrointestinal events, warning that "[f]or patients reporting severe adverse gastrointestinal reactions, it is advised to monitor renal function when initiating or escalating doses of oral semaglutide." For patients with other comorbidities, the study warned that "patients should be made aware of the occurrence of gastrointestinal adverse events with GLP-1RAs." The study further identified as one "key clinical take-home point" that "patients should be made aware of the occurrence of gastrointestinal adverse events with GLP-1RAs."[30]

57.    A July 2021 article funded and reviewed by Novo Nordisk considered 23 randomized control trials conducted across the United States, Japan, and China and concluded that "gastrointestinal disturbances" were "well-known" side effects associated with semaglutide use. When compared with placebos, the subcutaneous (injection) form of the drug induced nausea in up to 20% of patients (versus up to 8% on the placebo group), vomiting in up to 11.5% of patients (versus up to 3% in the placebo group) and diarrhea in up to 11.3% of patients (versus up to 6% in the placebo group). Overall, the percentage of patients experiencing adverse events that led to trial product discontinuation was greatest for gastrointestinal related adverse events, with some trials

---

[30] Mosenzon O, Miller EM, & Warren ML, *Oral semaglutide in patients with type 2 diabetes and cardiovascular disease, renal impairment, or other comorbidities, and in older patients*, Postgraduate Medicine (2020), 132:sup2, 37-47, available at https://doi.org/10.1080/00325481.2020.1800286 (visited on 9/26/23).

experiencing 100% discontinuation due to gastrointestinal related adverse events. The mean value of gastrointestinal related adverse events that led to discontinuation averaged 57.75%. The study acknowledges that while nausea and vomiting are unwanted side effects, "they may be partly responsible for aspects of the drug's efficacy[.]"[31]

58.    An October 2021 article in the Journal of Investigative Medicine ("JIM") concluded that because gastroparesis can be associated with several medications, "[i]t is crucial to identify the causative drugs as discontinuation of the drug can result in resolution of the symptoms[.]" In diabetics, making this determination can be particularly "tricky" because both diabetes and GLP-1RAs can cause delayed gastric emptying. As such, "the timeline of drug initiation and symptom onset becomes of the upmost importance." The authors reviewed two case reports (discussed below) and concluded that history taking and making an accurate diagnosis of diabetic gastroparesis versus medication-induced gastroparesis is critical.[32]

59.    Case Report #1 in JIM involved a 52-year-old female with long-standing (10 years) well-controlled, type 2 diabetes who had been taking weekly semaglutide injections approximately one month prior to the onset of gastroparesis symptoms. The patient was referred with a 7-month history of post-prandial epigastric pain, accompanied by fullness, bloating, and nausea. A gastric emptying study showed a 24% retention of isotope in the patient's stomach at four hours, indicative of delayed gastric emptying. The patient discontinued semaglutide and her symptoms resolved after six weeks. The case report authors concluded that "thorough history taking revealed the cause

---

[31] Smits MM & Van Raalte DH (2021), *Safety of Semaglutide*, Front. Endocrinol., 07 July 2021, doi: 10.3389/fendo.2021.645563, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8294388/ (visited on 9/26/23).

[32] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (visited on 9/26/23).

[of gastroparesis] to be medication induced."[33]

60.     Case Report #2 in JIM involved a 57-year-old female with a long-standing (16 years) type 2 diabetes who had been taking weekly dulaglutide injections (another GLP-1RA) for 15 months and suffering from abdominal bloating, nausea, and vomiting for 12 of those months. A gastric emptying study showed 35% retention of isotope in the patient's stomach at four hours, indicating delayed gastric emptying. After discontinuing dulaglutide, the patient experienced a gradual resolution of symptoms over a four-week period.[34]

61.     A June 2022 study reported GLP-1RA Mounjaro (tirzepatide) adverse events of vomiting, nausea, and "severe or serious gastrointestinal events."[35]

62.     An October 2022 study analyzed 5,442 GLP-1RA adverse gastrointestinal events. 32% were serious, including 40 deaths, 53 life-threatening conditions, and 772 hospitalizations. The primary events were nausea and vomiting. There were also adverse events for impaired gastric emptying.[36]

63.     A January 2023 meta-analysis of GLP-1RA (Mounjaro) adverse events reported high rates of nausea and vomiting.[37]

64.     In February 2023, a longitudinal study of GLP-1RA (dulaglutide) reported adverse

---

[33] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (visited on 9/26/23).
[34] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (visited on 9/26/23).
[35] Jastreboff, *Tirzepatide Once Weekly for the Treatment of Obesity*, N Engl J Med, at 214 (June 4, 2022) (https://doi.org/10.1056/nejmoa2206038).
[36] Shu, *Gastrointestinal adverse events associated with semaglutide: A pharmacovigilance study based on FDA adverse event reporting system*, Front. Public Health (Oct. 20, 2022). (https://doi.org/10.3389%2Ffpubh.2022.996179).
[37] Mirsha, *Adverse Events Related to Tirzepatide*, J. of Endocrine Society (Jan. 26, 2023) (https://doi.org/10.1210%2Fjendso%2Fbvad016).

events for nausea and vomiting, and one adverse event of impaired gastric emptying.[38]

65.    On March 28, 2023, a case study concluded that impaired gastric emptying is "a significant safety concern, especially since it is consistent with the known mechanism of action of the drug."[39]

66.    On June 29, 2023, the American Society of Anesthesiologists ("ASA") warned that patients taking semaglutide and other GLP-1RAs should stop the medication at least a week before elective surgery because these medications "delay gastric (stomach) emptying" and "the delay in stomach emptying could be associated with an increased risk of regurgitation and aspiration of food into the airways and lungs during general anesthesia and deep sedation." The ASA also warned that the risk is higher where patients on these medications have experienced nausea and vomiting.[40]

67.    News sources have identified the potential for serious side effects in users of Ozempic, including gastroparesis, leading to hospitalization.[41] For example, NBC News reported in January 2023 that some Ozempic users were discontinuing use because their symptoms were unbearable, and one user said that five weeks into taking the medication she found herself unable

---

[38] Chin, *Safety and effectiveness of dulaglutide 0.75 mg in Japanese patients with type 2 diabetes in real-world clinical practice: 36 month postmarketing observational study*, J Diabetes Investig (Feb. 2023) (https://doi.org/10.1111%2Fjdi.13932).

[39] Klein, Semaglutide, delayed gastric emptying, and intraoperative pulmonary aspiration: a case report, Can J. Anesth (Mar. 28, 2023) (https://doi.org/10.1007/s12630-023-02440-3).

[40] American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (June 29, 2023), available at https://www.asahq.org/about-asa/newsroom/news-releases/2023/06/patients-taking-popular-medications-for-diabetes-and-weight-loss-should-stop-before-elective-surgery (visited on 9/26/23).

[41] Penny Min, *Ozempic May Cause Potential Hospitalizations*, healthnews (June 26, 2023), available at https://healthnews.com/news/ozempic-may-cause-potential-hospitalizations/ (visited on 9/26/23); Elizabeth Laura Nelson, *These Are the 5 Most Common Ozempic Side Effects, According to Doctors*, Best Life (April 3, 2023), available at https://bestlifeonline.com/ozempic-side-effects-news/ (visited on 9/26/23); Cara Shultz, *Ozempic and Wegovy May Cause Stomach Paralysis in Some Patients*, People (July 26, 2023), available at https://people.com/ozempic-wegovy-weight-loss-stomach-paralysis-7565833 (visited on 9/26/23); CBS News Philadelphia, *Popular weight loss drugs Ozempic and Wegovy may cause stomach paralysis, doctors warn* (July 23, 2023), available at https://www.cbsnews.com/philadelphia/news/weight-loss-drugs-wegovy-ozempic-stomach-paralysis/ (visited on 9/26/23).

to move off the bathroom floor because she had "vomited so much that [she] didn't have the energy to get up."[42] CNN reported in July that one Ozempic user diagnosed with gastroparesis vomits so frequently that she had to take a leave of absence from her teaching job.[43]

68.     A July 25, 2023, article in Rolling Stone magazine—"*Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*"—highlighted three patients who have suffered severe gastrointestinal related events, including gastroparesis, as a result of their use of GLP-1RAs. Patient 1 (female, age 37) reported incidents of vomiting multiple times per day and being unable to eat. The patient's physician diagnosed her with severe gastroparesis and concluded that her problems were caused and/or exacerbated by her use of a GLP-1RA medication. Patient 2 (female) used Ozempic for one year and reported incidents of vomiting, including multiple times per day. The patient's physician diagnosed her with severe gastroparesis related to her Ozempic use. Patient 3 (female, age 42) experienced severe nausea both during and after she discontinued use of a GLP-1RA. In a statement to Rolling Stone, Novo Nordisk acknowledged that "[t]he most common adverse reactions, as with all GLP-1 RAs, are gastrointestinal related." Novo Nordisk further stated that while "GLP-1 RAs are known to cause a delay in gastric emptying, … [s]ymptoms of delayed gastric emptying, nausea and vomiting are listed as side effects." Novo Nordisk did not claim to have warned consumers about gastroparesis, or other severe gastrointestinal issues.[44]

69.     On July 25, 2023, CNN Health reported that patients taking Ozempic have been

---

[42] Bendix A, Lovelace B Jr., *What it's like to take the blockbuster drugs Ozempic and Wegovy, from severe side effects to losing 50 pounds*, NBC News (Jan. 29, 2023), available at https://www.nbcnews.com/health/health-news/ozempic-wegovy-diabetes-weight-loss-side-effects-rcna66493 (visited on 9/26/23).

[43] Brenda Goodman, *They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed*, CNN (July 25, 2023), available at https://www.cnn.com/2023/07/25/health/weight-loss-diabetes-drugs-gastroparesis/index.html (visited on 9/26/23).

[44] CT Jones, *Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*, Rolling Stone (July 25, 2023), available at https://www.rollingstone.com/culture/culture-news/ozempic-stomach-paralysis-weight-loss-side-effects-1234794601 (visited on 9/26/23).

diagnosed "with severe gastroparesis, or stomach paralysis, which their doctors think may have resulted from or been exacerbated by the medication they were taking, Ozempic." Another patient taking Wegovy (semaglutide) suffered ongoing nausea and vomiting, which was not diagnosed, but which needed to be managed with Zofran and prescription probiotics.[45]

70.     On July 26, 2023, a New York hospital published an article to its online health blog section "What You Need to Know About Gastroparesis" entitled "Delayed Stomach Emptying Can Be Result of Diabetes or New Weight-Loss Medicines." It was reported that a growing number of gastroparesis cases had been seen in people taking GLP-1RAs. The article noted that the weight-loss drugs can delay or decrease the contraction of muscles that mix and propel contents in the gastrointestinal tract leading to delayed gastric emptying. One concern raised was that patients and doctors often assume the symptoms of gastroparesis are reflux or other gastrointestinal conditions, meaning it may take a long time for someone to be diagnosed correctly.[46]

71.     In an October 5, 2023, Research Letter published in the Journal of the American Medical Association ("JAMA"), the authors examined gastrointestinal adverse events associated with GLP-1RAs used for weight loss in clinical setting and reported that use of GLP-1RAs compared with use of bupropion-naltrexone was associated with increased risk of pancreatitis, gastroparesis, and bowel obstruction.[47] The study found that patients prescribed GLP-1RAs were at 4.22 times higher risk of intestinal obstruction and at 3.67 times higher risk of gastroparesis.

72.     The medical literature listed above is not a comprehensive list, and several other

---

[45] Brenca Goodman, *They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed,* CNN Health (July 25, 2023), available at https://www.cnn.com/2023/07/25/health/weight-loss-diabetes-drugs-gastroparesis (last visited on 9/26/23).

[46] *Delayed Stomach Emptying Can Be Result of Diabetes or New Weight-Loss Medicines*, Montefiore Health Blog article (released July 26, 2023), available at https://www.montefiorenyack.org/health-blog/what-you-need-know-about-gastroparesis (last visited on 9/26/2023).

[47] Mohit Sodhi, et al., *Risk of Gastrointestinal Adverse Events Associated with Glucagon-Like Peptide-1 Receptor Agonists for Weight Loss*, JAMA (published online October 5, 2023), available at https://jamanetwork.com/journals/jama/fullarticle/2810542 (last visited 10/19/23).

case reports have indicated that GLP-1RAs can cause gastroparesis and impaired gastric emptying.[48]

73.    Defendants knew or should have known of the causal association between the use of GLP-1RAs and the risk of developing gastroparesis and its sequelae, but they ignored the causal association. Defendants' actual and constructive knowledge derived from their clinical studies, case reports, medical literature, including the medical literature and case reports referenced above in this Complaint.

74.    On information and belief, Defendants not only knew or should have known that their GLP-1RAs cause delayed gastric emptying, resulting in risks of gastroparesis, but they may have sought out the delayed gastric emptying effect due to its association with weight loss. For example, a recent study published in 2023 notes that "it has been previously proposed that long-acting GLP-1RAs could hypothetically contribute to reduced energy intake and weight loss by delaying GE [gastric emptying,]" and the study authors suggested "further exploration of peripheral mechanisms through which s.c. semaglutide, particularly at a dose of 2.4. mg/week, could potentially contribute to reduced food and energy intake."[49]

**D.    Defendants Failed to Warn of the Risk of Gastroparesis from Ozempic**

75.    The Prescribing Information for Ozempic (the "label") discloses "Warnings and Precautions" and "Adverse Reactions" but does not adequately warn of the risk of gastroparesis

---

[48] Cure, *Exenatide and Rare Adverse Events*, N. Eng. J. Med. (May 1, 2008)
(https://doi.org/10.1056/nejmc0707137); Rai, *Liraglutide-induced Acute Gastroparesis*, Cureus (Dec. 28, 2018)
(https://doi.org/10.7759%2Fcureus.3791); Guo, *A Post Hoc Pooled Analysis of Two Randomized Trials*, Diabetes
Ther (2020) (https://doi.org/10.1007%2Fs13300-020-00869-z); Almustanyir, *Gastroparesis With the Initiation of
Liraglutide: A Case Report*, Cureus (Nov. 28, 2020) (https://doi.org/10.7759/cureus.11735); Ishihara, *Suspected
Gastroparesis With Concurrent Gastroesophageal Reflux Disease Induced by Low-Dose Liraglutide*, Cureus (Jul.
16, 2022) (https://doi.org/10.7759/cureus.26916); Preda, *Gastroparesis with bezoar formation in patients treated
with glucagon-like peptide-1 receptor agonists: potential relevance for bariatric and other gastric surgery*, BJS
Open (Feb. 2023) (https://doi.org/10.1093%2Fbjsopen%2Fzrac169).
[49] Jensterle M et al., *Semaglutide delays 4-hour gastric emptying in women with polycystic ovary syndrome and
obesity*, 25(4) Diabetes Obes. Metab. 975-984 (April 2023), available at https://dom-
pubs.onlinelibrary.wiley.com/doi/epdf/10.1111/dom.14944 (visited on 9/26/23).

and its sequalae.[50]

76.    The Ozempic label lists nausea, vomiting, diarrhea, abdominal pain, and constipation as common adverse reactions reported in Ozempic patients, but it does not include these adverse reactions in its "Warnings and Precautions" section, nor does it warn that these adverse reactions are symptoms of more severe conditions, including gastroparesis. In fact, gastroparesis is not mentioned at all in the label.

77.    Instead of properly disclosing gastrointestinal risks, the label discloses delayed gastric emptying in the "Drug Interaction" section and notes that Ozempic "may impact absorption of concomitantly administered oral medications." Similarly, in the "Mechanism of Action" section, the label minimizes gastrointestinal risks by stating that "[t]he mechanism of blood glucose lowering also involves a minor delay in gastric emptying in the early postprandial phase." These statements only describe the drug's mechanism of action and do not disclose gastroparesis as a *risk* of taking Ozempic, nor do they disclose gastroparesis as a chronic condition that can result as a consequence of taking Ozempic.

78.    Similarly, Novo Nordisk's main promotional website for Ozempic (ozempic.com) includes a variety of information about the benefits of Ozempic relating to blood sugar, cardiovascular health, and weight loss, as well as "Important Safety Information" – however, Novo Nordisk does not disclose the risk of gastroparesis within the "Important Safety Information" section of their promotional website.[51]

79.    None of Defendants' additional advertising or promotional materials warned prescription providers or the general public of the risks of gastroparesis and its sequalae.

80.    In January 2020, Novo Nordisk removed the "Instructions" portion from Section

---

[50] https://www.novo-pi.com/ozempic.pdf
[51] *See* Ozempic.com (visited on 10/16/23).

17 "Patient Counseling Information" of the Ozempic label, which had instructed prescribers to "[a]dvise patients that the most common side effects of Ozempic are nausea, vomiting, diarrhea, abdominal pain and constipation." These instructions were present in the 2017 and 2019 labels.

81.     The 2017 and 2019 labels for Ozempic also instructed physicians that "vomiting … decreases over time in the majority of patients." As a result, a physician would not only fail to appreciate vomiting as a symptom of gastroparesis but, even worse, would encourage a patient to continue using Ozempic despite symptoms of gastroparesis.

82.     In its section on "Females and Males of Reproductive Potential," the Ozempic label advises female users to discontinue Ozempic at least 2 months before a planned pregnancy due to the long washout period for semaglutide. This demonstrates that Novo Nordisk knew or should have known that symptoms, such as continuous and violent vomiting, can linger long after the drugs are discontinued and shows the need to warn of gastroparesis and its sequelae.

83.     From the date Novo Nordisk received FDA approval to market Ozempic until the present time, Novo Nordisk made, distributed, marketed, and/or sold Ozempic without adequate warning to Plaintiff's prescribing physician(s) and/or Plaintiff that Ozempic was causally associated with and/or could cause gastroparesis and its sequelae.

84.     Defendants knew or should have known of the causal association between the use of GLP-1RAs and the risk of developing gastroparesis and its sequelae. Defendants' actual and constructive knowledge derived from their clinical studies, case reports, and the medical literature, including the medical literature and case reports referenced in this Complaint.

85.     Upon information and belief, Defendants ignored the causal association between the use of GLP-1RAs and the risk of developing gastroparesis and its sequelae.

86.     Novo Nordisk's failure to disclose information that they possessed regarding the

causal association between the use of GLP-1RAs and the risk of developing gastroparesis and its sequelae, rendered the warnings for Ozempic inadequate.

87.     On information and belief, as a result of Novo Nordisk's inadequate warnings, the medical community at large, and Plaintiff's prescribing physician in particular, were not aware that Ozempic can cause gastroparesis, nor were they aware that "common adverse reactions" listed on the label might be sequelae of gastroparesis.

88.     On information and belief, had Novo Nordisk adequately warned Plaintiff's prescribing physician that Ozempic is causally associated with gastroparesis and its sequelae, then the physician's prescribing decision would have changed by not prescribing Ozempic, or by monitoring Plaintiff's health for symptoms of gastroparesis and discontinuing Ozempic when the symptoms first started.

89.     By reason of the foregoing acts and omissions, Plaintiff was and still is caused to suffer from gastroparesis and its sequelae, which resulted in severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE - FAILURE TO WARN – AGAINST ALL DEFENDANTS)

90.     Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

91.     Arkansas law imposes a duty on producers, manufacturers, distributors, lessors, and sellers of a product to exercise all reasonable care when producing, manufacturing, distributing,

leasing, and selling their products.

92.    At all times mentioned herein, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Ozempic that was used by Plaintiff.

93.    Ozempic was expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Defendants.

94.    At all relevant times, and at the times Ozempic left Defendants' control, Defendants knew or should have known that Ozempic was unreasonably dangerous because they did not adequately warn of the risk of gastroparesis and its sequelae, especially when used in the form and manner as provided by Defendants.

95.    Despite the fact that Defendants knew or should have known that Ozempic caused unreasonably dangerous injuries, Defendants continued to market, distribute, and/or sell Ozempic to consumers, including Plaintiff, without adequate warnings.

96.    Despite the fact that Defendants knew or should have known that Ozempic caused unreasonably dangerous injuries, Defendants continued to market Ozempic to prescribing physicians, including Plaintiff's prescribing physician(s), without adequate warnings.

97.    Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

98.    At all relevant times, given its increased safety risks, Ozempic was not fit for the ordinary purpose for which it was intended.

99.    At all relevant times, given its increased safety risks, Ozempic did not meet the

reasonable expectations of an ordinary consumer, particularly Plaintiff.

100.    Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Ozempic into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous injuries, such as gastroparesis and its sequelae.

101.    At all relevant times, Plaintiff was using Ozempic for the purposes and in a manner normally intended—namely, as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

102.    The Ozempic designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate warnings or instructions, as Defendants knew or should have known that the product created a risk of serious and dangerous injuries, including gastroparesis and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, and Defendants failed to adequately warn of said risk.

103.    The Ozempic designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects, including gastroparesis and its sequalae, as well as other severe and permanent health consequences from Ozempic, they failed to provide adequate warnings to users and/or prescribers of the product, and continued to improperly advertise, market and/or promote their product, Ozempic.

104.    The label for Ozempic was inadequate because it did not warn and/or adequately

warn of all possible adverse side effects causally associated with the use of Ozempic, including the increased risk of gastroparesis and its sequelae.

105.    The label for Ozempic was inadequate because it did not warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae.

106.    The label for Ozempic was inadequate because it did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Ozempic.

107.    The label for Ozempic was inadequate because it did not warn and/or adequately warn of the severity and duration of adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects.

108.    Communications made by Defendants to Plaintiff and Plaintiff's prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Ozempic, including the increased risk of gastroparesis and its sequelae.

109.    Communications made by Defendants to Plaintiff and Plaintiff's prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae.

110.    Plaintiff had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and Plaintiff's reliance upon Defendants' warnings was reasonable.

111.    Plaintiff's prescribing physician(s) had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and his/her/their reliance upon Defendants' warnings was reasonable.

112.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risks of gastroparesis and its sequalae, which are causally associated with Ozempic, then the prescribing physician would not have prescribed Ozempic and/or would have provided Plaintiff with adequate warnings regarding the dangers of Ozempic, so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic.

113.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae, the prescribing physician would not have prescribed Ozempic and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic, so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic.

114.    If Plaintiff had been warned of the increased risks of gastroparesis and its sequelae, which are causally associated with Ozempic, then Plaintiff would not have used Ozempic and/or suffered from gastroparesis and its sequelae.

115.    If Plaintiff had been warned that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequalae, then Plaintiff would not have used Ozempic and/or suffered gastroparesis and its sequelae.

116.    If Plaintiff had been warned of the increased risks of gastroparesis and its sequelae, which is causally associated with Ozempic, then Plaintiff would have informed Plaintiff's prescribing physician(s) that Plaintiff did not want to take Ozempic.

117.    Upon information and belief, if Plaintiff had informed Plaintiff's prescribing physician(s) that Plaintiff did not want to take Ozempic due to the risks of gastroparesis and its sequelae, or the lack of adequate testing for safety risks, then Plaintiff's prescribing physician(s)

would not have prescribed Ozempic.

118.    By reason of the foregoing, Defendants have become liable to Plaintiff for the designing, marketing, promoting, distribution and/or selling of an unreasonably dangerous product, Ozempic.

119.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendants are therefore liable for the injuries sustained by Plaintiff.

120.    Defendants' inadequate warnings for Ozempic were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

121.    Said inadequate warnings for Defendants' drug Ozempic were a substantial factor in causing Plaintiff's injuries.

122.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous injuries, including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, including physical pain, mental anguish, diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

123.    As a result of the foregoing acts and omissions Plaintiff did incur medical, health, incidental, and related expenses, and requires and/or will require more health care and services. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## SECOND CAUSE OF ACTION
## (STRICT LIABILITY - FAILURE TO WARN –
## AGAINST ALL DEFENDANTS)

124.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

125.    Arkansas law imposes a duty on manufacturers of prescription drugs to minimize the risk of danger when producing, manufacturing, distributing, leasing, and selling their products. At all times mentioned herein, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Ozempic that was used by Plaintiff.

126.    Ozempic was expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Defendants.

127.    At all relevant times, and at the times Ozempic left Defendants' control, Defendants knew or should have known that Ozempic was unreasonably dangerous because they did not adequately warn of the risk of gastroparesis and its sequelae, especially when used in the form and manner as provided by Defendants.

128.    Despite the fact that Defendants knew or should have known that Ozempic caused unreasonably dangerous injuries, Defendants continued to produce, manufacture, market, distribute, and/or sell Ozempic to consumers, including Plaintiff, without adequate warnings.

129.    Despite the fact that Defendants knew or should have known that Ozempic caused unreasonably dangerous injuries, Defendants continued to market Ozempic to prescribing physicians, including Plaintiff's prescribing physician(s), without adequate warnings.

130.    Defendants knew or should have known that consumers such as Plaintiff

27

would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

131.    At all relevant times, given its increased safety risks, Ozempic was not fit for the ordinary purpose for which it was intended.

132.    At all relevant times, given its increased safety risks, Ozempic did not meet the reasonable expectations of an ordinary consumer, particularly Plaintiff.

133.    Due to its risk of gastroparesis and its sequelae and inadequate warning thereof, Ozempic was dangerous to an extent beyond which would be contemplated by an ordinary consumer, who had ordinary knowledge as to Ozempic's characteristics, such as Plaintiff.

134.    Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Ozempic into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous injuries, such as gastroparesis and its sequelae.

135.    At all relevant times, Plaintiff was using Ozempic for the purposes and in a manner normally intended—namely, as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

136.    The Ozempic designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate warnings or instructions, as Defendants knew or should have known that the product created a risk of serious and dangerous injuries, including gastroparesis and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, and Defendants failed to adequately warn of said risk.

137.    The Ozempic designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects, including gastroparesis and its sequalae, as well as other severe and permanent health consequences from Ozempic, they failed to provide adequate warnings to users and/or prescribers of the product, and continued to improperly advertise, market and/or promote their product, Ozempic.

138.    The label for Ozempic was inadequate because it did not warn and/or adequately warn of all possible adverse side effects causally associated with the use of Ozempic, including the increased risk of gastroparesis and its sequelae.

139.    The label for Ozempic was inadequate because it did not warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae.

140.    The label for Ozempic was inadequate because it did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Ozempic.

141.    The label for Ozempic was inadequate because it did not warn and/or adequately warn of the severity and duration of adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects.

142.    Communications made by Defendants to Plaintiff and Plaintiff's prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Ozempic, including the increased risk of gastroparesis and its sequelae.

143.    Communications made by Defendants to Plaintiff and Plaintiff's prescribing

physician(s) were inadequate because Defendants failed to warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae.

144.    Plaintiff had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and Plaintiff's reliance upon Defendants' warnings was reasonable.

145.    Plaintiff's prescribing physician(s) had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and his/her/their reliance upon Defendants' warnings was reasonable.

146.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risks of gastroparesis and its sequalae, which are causally associated with Ozempic, then the prescribing physician would not have prescribed Ozempic and/or would have provided Plaintiff with adequate warnings regarding the dangers of Ozempic so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic.

147.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae, the prescribing physician would not have prescribed Ozempic and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic.

148.    If Plaintiff had been warned of the increased risks of gastroparesis and its sequelae, which are causally associated with Ozempic, then Plaintiff would not have used Ozempic and/or suffered from gastroparesis and its sequelae.

149.    If Plaintiff had been warned that Ozempic had not been sufficiently and/or

adequately tested for safety risks, including gastroparesis and its sequalae, then Plaintiff would not have used Ozempic and/or suffered gastroparesis and its sequelae.

150.    If Plaintiff had been warned of the increased risks of gastroparesis and its sequelae, which is causally associated with Ozempic, then Plaintiff would have informed Plaintiff's prescribers that Plaintiff did not want to take Ozempic.

151.    Upon information and belief, if Plaintiff had informed Plaintiff's prescribing physician(s) that Plaintiff did not want to take Ozempic due to the risks of gastroparesis and its sequelae, or the lack of adequate testing for safety risks, then Plaintiff's prescribing physician(s) would not have prescribed Ozempic.

152.    By reason of the foregoing, Defendants have become liable to Plaintiff for the designing, marketing, promoting, distribution and/or selling of an unreasonably dangerous product, Ozempic.

153.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendants are therefore liable for the injuries sustained by Plaintiff.

154.    Defendants' inadequate warnings for Ozempic were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

155.    Said inadequate warnings for Defendants' drug Ozempic were a substantial factor in causing Plaintiff's injuries.

156.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous injuries, including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, including physical pain,

mental anguish, diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

157.    As a result of the foregoing acts and omissions Plaintiff did incur medical, health, incidental, and related expenses, and requires and/or will require more health care and services. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

### THIRD CAUSE OF ACTION
### (BREACH OF EXPRESS WARRANTY UNDER ARK. CODE ANN. § 4-2-313 - AGAINST ALL DEFENDANTS)

158.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

159.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Ozempic that was used by Plaintiff.

160.    At all relevant times, Defendants expressly warranted to Plaintiff and Plaintiff's prescribing physician(s) that Ozempic was safe as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

161.    The aforementioned express warranties were made to Plaintiff and Plaintiff's prescribing physician(s) by way of Ozempic's label, website, advertisements, promotional materials, and through other statements.

162.    As a result of Defendants' express warranties, Plaintiff's prescribing physician was induced to prescribe Ozempic to Plaintiff, and Plaintiff was induced to use Ozempic.

163.    At all relevant times, Defendants reasonably anticipated and expected that

individuals, such as Plaintiff, would use and/or consume Ozempic based upon their express warranties.

164.    At all relevant times, Defendants reasonably anticipated and expected that prescribing physicians, such as Plaintiff's prescribing physician(s), would recommend, prescribe and/or dispense Ozempic based upon their express warranties.

165.    At all relevant times, Defendants knew or should have known that Ozempic was unreasonably dangerous because of its increased risk of gastroparesis and its sequelae, especially when the drug was used in the form and manner as provided by Defendants.

166.    At all relevant times, Defendants knew or should have known that Ozempic had not been sufficiently and/or adequately tested for safety.

167.    The unreasonably dangerous characteristics of Ozempic were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drug's characteristics.

168.    The unreasonably dangerous characteristics of Ozempic were beyond that which would be contemplated by Plaintiff's prescribing physician(s), with the ordinary knowledge common to prescribing physician as to the drugs' characteristics.

169.    At the time Ozempic left Defendants' control, Ozempic did not conform to Defendants' express warranties because Ozempic was not safe to use as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus, in that it was causally associated with increased risks of gastroparesis and its sequelae.

170.    The express warranties made by Defendants regarding the safety of Ozempic were made with the intent to induce Plaintiff to use the product and/or Plaintiff's prescribing physician(s) to prescribe the product.

171.    Defendants knew and/or should have known that by making the express warranties to Plaintiff and/or Plaintiff's prescribing physician(s), it would be the natural tendency of Plaintiff to use Ozempic and/or the natural tendency of Plaintiff's prescribing physician(s) to prescribe Ozempic.

172.    Plaintiff and Plaintiff's prescribing physician(s), as well as members of the medical community, relied on the express warranties of Defendants identified herein.

173.    Had Defendants not made these express warranties, Plaintiff would not have used Ozempic and/or, upon information and belief, Plaintiff's prescribing physician(s) would not have prescribed Ozempic.

174.    Plaintiff's injuries and damages were directly caused by Defendants' breach of the aforementioned express warranties.

175.    Plaintiff's injuries and damages arose from a reasonably anticipated use of the products by Plaintiff.

176.    Accordingly, Defendants are liable as a result of their breach of express warranties to Plaintiff.

177.    As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, including physical pain, mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

178.    As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses.

Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

### FOURTH CAUSE OF ACTION
### (BREACH OF IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS UNDER ARK. CODE ANN. §§ 4-2-314, 4-2-315 - AGAINST ALL DEFENDANTS)

179.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

180.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Ozempic that was used by Plaintiff.

181.    Ozempic was expected to and did reach the usual consumers, handlers, and persons encountering said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

182.    At all relevant times, Defendants impliedly warranted to Plaintiff, Plaintiff's prescribing physician(s), and the medical community that Ozempic was of merchantable quality and safe and fit for its ordinary purpose.

183.    At all relevant times, Defendants knew or should have known that Ozempic was unreasonably dangerous because of its increased risk of gastroparesis and its sequelae, especially when the drug was used in the form and manner as provided by Defendants.

184.    At all relevant times, Defendants knew or should have known that Ozempic had not been sufficiently and/or adequately tested for safety.

185.    At the time Ozempic left Defendants' control, Ozempic did not conform to Defendants' implied warranty of merchantability and was unfit for its ordinary purpose because Defendants failed to provide adequate warnings of the drug's causal association with increased

risk of gastroparesis and its sequelae.

186.    At all relevant times, Defendants reasonably anticipated and expected that prescribing physician(s), such as Plaintiff's prescribing physician(s), would recommend, prescribe and/or dispense Ozempic for use by their patients to improve glycemic control in adults with type 2 diabetes, reduce cardiovascular risk, and/or to promote weight loss.

187.    At all relevant times, Defendants reasonably anticipated and expected that individuals, such as Plaintiff, would use and/or consume Ozempic for its ordinary purpose.

188.    Despite the fact that Defendants knew or should have known that Ozempic causes unreasonably dangerous injuries, such as gastroparesis and its sequelae, Defendants continued to market, distribute, and/or sell Ozempic to consumers, including Plaintiff, without adequate warnings.

189.    The unreasonably dangerous characteristics of Ozempic were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drugs' characteristics.

190.    The unreasonably dangerous characteristics of Ozempic were beyond that which would be contemplated by Plaintiff's prescribing physician(s), with the ordinary knowledge common to prescribing physician as to the drugs' characteristics.

191.    Plaintiff reasonably relied on Defendants' implied warranties of merchantability and fitness relating to Ozempic's safety and efficacy.

192.    Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether Ozempic was of merchantable quality and safe and fit for its intended use.

193.    Upon information and belief, Plaintiff's prescribing physician(s) relied on Defendants' implied warranties of merchantability and fitness for the ordinary use and purpose

relating to Ozempic.

194.    Upon information and belief, Plaintiff's prescribing physician(s) reasonably relied upon the skill and judgment of Defendants as to whether Ozempic was of merchantable quality and safe and fit for its intended use.

195.    Had Defendants not made these implied warranties, Plaintiff would not have used Ozempic and/or, upon information and belief, Plaintiff's prescribing physician(s) would not have prescribed Ozempic, and/or would have altered his/her/their prescribing practices and/or would have provided Plaintiff with adequate warnings regarding the dangers of Ozempic to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic.

196.    Defendants herein breached the aforesaid implied warranties of merchantability and fitness because the drug Ozempic was not fit for its intended purposes.

197.    Defendants' breaches of the implied warranties of merchantability and fitness were a substantial factor in causing Plaintiff's injuries.

198.    As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

199.    As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## FIFTH CAUSE OF ACTION
## (FRAUDULENT CONCEALMENT –
## AGAINST ALL DEFENDANTS)

200.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

201.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Ozempic that was used by Plaintiff.

202.    At all relevant times, Defendants knew or should have known that Ozempic had not been adequately and/or sufficiently tested for safety.

203.    At all relevant times, Defendants knew or should have known that Ozempic was unreasonably dangerous because of the increased risk of gastroparesis and its sequelae, especially when the drug was used in the form and manner as provided by Defendants.

204.    Defendants had a duty to disclose material information about Ozempic to Plaintiff and Plaintiff's prescribing physician(s), namely that Ozempic is causally associated with increased risk of gastroparesis and its sequelae, because Defendants have superior knowledge of the drug and its dangerous side effects, this material information is not readily available to Plaintiff or Plaintiff's prescribing physician(s) by reasonable inquiry, and Defendants knew or should have known that Plaintiff and Plaintiff's prescribing physician(s) would act on the basis of mistaken knowledge.

205.    Nonetheless, Defendants consciously and deliberately withheld and concealed from Plaintiff's prescribing physician(s), Plaintiff, the medical and healthcare community, and the general public this material information.

206.    Although the Ozempic labels lists nausea, vomiting, diarrhea, abdominal pain, and

constipation as common adverse reactions reported in Ozempic patients, it does not mention gastroparesis as a risk of taking Ozempic, nor does it disclose gastroparesis as a chronic condition that can result as a consequence of taking Ozempic.

207.    Defendants' promotional website for Ozempic similarly does not disclose that Ozempic is causally associated with increased risk of gastroparesis.

208.    Defendants' omissions and concealment of material facts were made purposefully, willfully, wantonly, and/or recklessly in order to mislead and induce medical and healthcare providers, such as Plaintiff's prescribing physician(s), and adult Type 2 diabetes patients, such as Plaintiff, to dispense, provide, prescribe, accept, purchase, and/or consume Ozempic for treatment of Type 2 Diabetes.

209.    Defendants knew or should have known that Plaintiff's prescribing physician(s) would prescribe, and Plaintiff would use Ozempic without the awareness of the risks of serious side effects, including gastroparesis and its sequelae.

210.    Defendants knew that Plaintiff and Plaintiff's prescribing physicians(s) had no way to determine the truth behind Defendants' misrepresentations and concealments surrounding Ozempic, as set forth herein.

211.    Upon information and belief, Plaintiffs prescribing physician(s) justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to dispense, provide, and prescribe Ozempic.

212.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of gastroparesis causally associated with Ozempic, they would not have prescribed Ozempic and/or would have provided Plaintiff with adequate information regarding the increased risk of gastroparesis causally associated with Ozempic to allow Plaintiff to make an

informed decision regarding Plaintiff's use of Ozempic.

213.    Upon information and belief, had Plaintiff's prescribing physician(s) been told that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae, they would not have prescribed Ozempic and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic.

214.    Plaintiff justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to purchase and/or consume Ozempic.

215.    Had Plaintiff been informed of the increased risks causally associated with Ozempic, Plaintiff would not have used Ozempic and/or suffered gastroparesis and its sequelae.

216.    Defendants' fraudulent concealments were a substantial factor in causing Plaintiff's injuries.

217.    As a result of the above stated omissions as described herein, Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

218.    As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## SIXTH CAUSE OF ACTION
## (FRAUDULENT MISREPRESENTATION –

**AGAINST ALL DEFENDANTS)**

219.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

220.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Ozempic that was used by Plaintiff.

221.    At all relevant times, Defendants knew or should have known that Ozempic had not been adequately and/or sufficiently tested for safety.

222.    At all relevant times, Defendants knew or should have known of the serious side effects of Ozempic, including gastroparesis and its sequelae.

223.    At all relevant times, Defendants knew or should have known that Ozempic was not safe to improve glycemic control in adults with type 2 diabetes, reduce cardiovascular risk in patients with type 2 diabetes, or promote weight loss, given its increased risk of gastroparesis.

224.    Nonetheless, Defendants made material misrepresentations to Plaintiff, Plaintiff's prescribing physician(s), the medical and healthcare community at large, and the general public regarding the safety and/or efficacy of Ozempic.

225.    Defendants represented affirmatively and by omission in advertisements and on the label of Ozempic that Ozempic was a safe and effective drug for treatment of adults with Type 2 diabetes, despite being aware of increased risks of gastroparesis and its sequelae causally associated with using Ozempic.

226.    Defendants were aware or should have been aware that its representations were false or misleading and knew that they were concealing and/or omitting material information from Plaintiff, Plaintiff's prescribing physician(s), the medical and healthcare community, and the

general public.

227.    Defendants' misrepresentations of material facts were made purposefully, willfully, wantonly, and/or recklessly, in order to mislead and induce medical and healthcare providers, such as Plaintiff's prescribing physician(s), and adult Type 2 diabetes patients, such as Plaintiff, to dispense, provide, prescribe, accept, purchase, and/or consume Ozempic for treatment of Type 2 Diabetes.

228.    Upon information and belief, Plaintiff's prescribing physician(s) had no way to determine the truth behind Defendants' false and/or misleading statements, concealments and omissions surrounding Ozempic, and reasonably relied on false and/or misleading facts and information disseminated by Defendants, which included Defendants' omissions of material facts, which Plaintiff's prescribing physician(s) had no way to know were omitted.

229.    Upon information and belief, Plaintiff's prescribing physician(s) justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to prescribe Ozempic to Plaintiff.

230.    Upon information and belief, had Plaintiff's prescribing physician(s) been informed of the increased risk of gastroparesis causally associated with Ozempic, Plaintiff's prescribing physician(s) would not have prescribed Ozempic and/or would have provided Plaintiff with adequate information regarding safety of Ozempic to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic.

231.    Upon information and belief, had Plaintiff's prescribing physician(s) been told that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae, they would not have prescribed Ozempic and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic so that

Plaintiff can make an informed decision regarding Plaintiff's use of Ozempic.

232.    Plaintiff had no way to determine the truth behind Defendant's false and/or misleading statements, concealments and omissions surrounding Ozempic, and reasonably relied on false and/or misleading facts and information disseminated by Defendants, which included Defendants' omissions of material facts, which Plaintiff had no way to know were omitted.

233.    Plaintiff justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to accept, purchase and/or consume Ozempic.

234.    Had Plaintiff been told of the increased risk of gastroparesis and its sequelae causally associated with Ozempic, Plaintiff would not have used Ozempic and/or suffered gastroparesis and its sequelae.

235.    Had Plaintiff been told of the lack of sufficient and/or appropriate testing of Ozempic for safety risks, including gastroparesis and its sequelae, Plaintiff would not have used Ozempic and/or suffered gastroparesis and its sequelae.

236.    As a result of the above stated false representations and/or omissions as described herein, Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

237.    As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical

and/or hospital care, attention, and services.

## SEVENTH CAUSE OF ACTION
## (UNFAIR TRADE/CONSUMER PROTECTION VIOLATIONS UNDER THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT §§ 4-88-107(a), 4-88-108(a) – AGAINST ALL DEFENDANTS)

238.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

239.    Defendants deliberately and/or negligently misrepresented the safety of Ozempic and concealed the risks attendant to the use of Ozempic. Through their misrepresentations, Defendants' conduct had the tendency or capacity to deceive, and affected the decisions of consumers, particularly Plaintiff and Plaintiff's prescribing physician(s), to purchase, prescribe and use Ozempic, and to exclude the option of not using Ozempic for treatment.

240.    All Defendants, while engaged in the conduct and practices identified above, committed one or more violations of state laws related to unfair or deceptive acts or practices, including but not limited to, the following:

    a.  Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of Ozempic;

    b.  Representing that Ozempic has sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that it does not have;

    c.  Representing that Defendants' authors, key opinion leaders, consultants, and speakers do not have a sponsorship, approval, status, affiliation, or connection that they do have;

    d.  Representing that Ozempic is of a particular standard, quality, or grade;

e.  Concealing information that gastroparesis is a risk of taking Ozempic and a chronic condition that can result as a consequence of taking Ozempic;

f.  Concealing information that Ozempic had not been adequately and/or sufficiently tested for safety;

g.  Engaging in other fraudulent or deceptive conduct which creates the likelihood of confusion or of misunderstanding, as alleged in this Complaint.

241.    As a result of the above stated false representations and/or omissions as described herein, Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

242.    As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## EIGHTH CAUSE OF ACTION
## (NEGLIGENCE - DESIGN DEFECT –
## AGAINST ALL DEFENDANTS)

243.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

244.    Defendants are liable to Plaintiff for the injuries and damages sustained due to Defendants' negligent design and/or formulation of Ozempic.

245.    At all relevant times to this lawsuit, Defendants owed a duty to consumers including Plaintiff and Plaintiff's prescribing physician(s), to assess, manage, and communicate the risks, dangers, and adverse effects of Ozempic. Defendants' duties included, but were not limited to, carefully and properly designing, testing, studying, and manufacturing Ozempic.

246.    Defendants negligently and carelessly breached the above-described duties to Plaintiff by, among other acts and omissions, negligently and carelessly:

    a.    Failing to use ordinary care in designing, testing, and manufacturing Ozempic;

    b.    Failing to design Ozempic as to properly minimize the adverse effects on the gastrointestinal and immune systems;

    c.    Failing to counteract in the design the known adverse effects on the gastrointestinal and immune systems;

    d.    Designing a product, namely Ozempic, where the benefits were greatly outweighed by the risks, including malnutrition, cyclical vomiting, gastroparesis, gastroenteritis, intestinal obstruction/blockage, ileus, DVT and associated pulmonary embolism, gallbladder problems necessitating surgery, intraoperative aspiration, and death;

    e.    Designing a product, namely Ozempic, without taking into consideration the proper dosage that could avoid malnutrition, cyclical vomiting, gastroparesis, gastroenteritis, intestinal obstruction/blockage, ileus, DVT and associated pulmonary embolism, gallbladder problems necessitating surgery, intraoperative aspiration, and death;

    f.    Designing a product, namely Ozempic, that when it left Defendants' hands, the foreseeable risks exceeded the benefits associated with the design or formulation.

247.    At all reasonable times, given its lack of efficacy and increased safety risks, Ozempic did not meet the reasonable expectations of an ordinary consumer, particularly the Plaintiff, or in the alternative, Plaintiff's prescribing physicians(s).

248.    Ozempic was defective in design or formulation in that, when it left Defendants' hands, it was unreasonably dangerous, more dangerous than an ordinary consumer, particularly the Plaintiff and Plaintiff's prescribing physician(s) would expect, and more dangerous than other similar drugs.

249.    Despite Defendants' knowledge of the foreseeable risks and unreasonably dangerous nature of Ozempic, Defendants designed and brought the product to market and continued to market the drug when there were safer alternatives available, including but not limited to alternative dosing, reduced exposure, among others.

250.    As a direct and proximate result of Defendants' negligent and reckless design, Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

251.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above-

referenced claims and Causes of Action and as follows:

1.    Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering for severe and permanent personal injuries sustained by Plaintiff, health care costs, medical monitoring, together with interest and costs as provided by law;

2.    Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of Defendants, who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

3.    Awarding Plaintiff the costs of these proceedings; and

4.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated: April 30, 2025

THE GORI LAW FIRM, P.C.

*/s/ Evan D. Buxner*
Evan D. Buxner, IL#6221006 (Pro Hac Vice)
The Gori Law Firm, P.C.
156 N. Main Street
Edwardsville, IL 62025
Ph: 618-659-9833
Fax: 618-659-9834
ebuxner@gorilaw.com

*Attorneys for Plaintiffs*
